Cavanagh, J.
(dissenting). In these cases, this Court is called upon to interpret MCL 500.3135. Because I disagree with the majority’s construction of MCL 500.3135(7) and the result reached in these cases, I must respectfully dissent. Accordingly, I would affirm the decisions of the Court of Appeals.
I. RULES OF STATUTORY INTERPRETATION
Questions of statutory interpretation are questions of law, which this Court reviews de novo. In re MCI Telecom Complaint, 460 Mich 396, 413; 596 NW2d 164 (1999). “The primary goal of statutory interpretation is to give effect to the intent of the Legislature.” Id. at 411. To this end, this Court abides by the governing principle that the first step in determining the Legislature’s intent is to examine the language of the statute itself. Id. “If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible.” Id.
*140 II. MCL 500.3135
MCL 500.3135(1) unambiguously states that “[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.” MCL 500.3135(2) provides in pertinent part:
For a cause of action for damages pursuant to subsection (1) filed on or after July 26,1996, all of the following apply:
(a) The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
(i) There is no factual dispute concerning the nature and extent of the person’s injuries.
(ii) There is a factual dispute concerning the nature and extent of the person’s injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.
Pursuant to the plain and unambiguous language of § 3135(2), the trial court determines, as a question of law, whether a particular plaintiff has satisfied the tort threshold under two enumerated circumstances. Namely, (1) where there is no factual dispute concerning the plaintiffs injuries, or (2) where there is a factual dispute concerning the plaintiffs injuries, but the dispute is not material or outcome determinative regarding whether the plaintiff suffered a serious impairment of body function or permanent serious disfigurement.
The question becomes, however, who decides whether a particular plaintiff has satisfied the tort threshold where there is a factual dispute concerning *141 the nature and extent of the plaintiffs injuries and such a dispute is material or outcome determinative with respect to the serious impairment of body function or permanent serious disfigurement issue. The most natural reading of the statute suggests that in such a situation, a question of fact is presented for the jury and the jury decides whether the plaintiff has suffered a serious impairment of body function or permanent serious disfigurement.
Important to the resolution of these cases is the statutory definition of “serious impairment of body function.” MCL 500.3135(7) unambiguously states, “As used in this section, ‘serious impairment of body function’ means an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” The Legislature’s definition necessarily contains three elements. A serious impairment of body function is (1) an objectively manifested impairment, (2) of an important body function, (3) that affects the person’s general ability to lead his normal life. All three requirements must be satisfied and, thus, a thorough review of each requirement is necessary.
A. OBJECTIVELY MANIFESTED
The clear import of the “objectively manifested” requirement is that the impairment must be observable or identifiable in order for the impairment to satisfy the first prong of the legislative definition. “Objective” means “1. Of or having to do with a material object as distinguished from a mental concept. 2. Having actual existence or reality. 3. a. Uninfluenced by emotion, surmise, or personal prejudice, b. Based on observable phenomena; presented factually.. . .” The American Heritage Dictionary, Second College Edition (1982). *142 Further, “manifest” means “[c]learly apparent to the sight or understanding.... To show or demonstrate plainly; reveal....” Id. Thus, the first prong of the serious impairment of body function analysis is, effectively, an objective inquiry.
B. OF AN IMPORTANT BODY FUNCTION
Once it is determined that the impairment is objectively manifested, the trial court or jury must then decide whether an important body function is impaired. “Important” means “[mjarked by or having great value, significance, or consequence.” Id. Importance or value is necessarily a subjective inquiry — what may be important to one individual may not be as important or valuable to another. As such, the Legislature plainly intended the second prong of the analysis to be subjective in nature, in contrast to the first prong.[1] Thus, the “of an important body function” analysis does not lend itself to any judicial line drawing, and the utilization of nonexhaustive factors is unwarranted.
For example, suppose a person is injured in a motor vehicle accident and, as result, the person is unable to fully manipulate her pinky finger to some degree. To an “average” person, the ability to fully extend or bend her pinky finger may not be important. But suppose the person injured in the motor vehicle accident is Roger Clemens (and he loses the zip on his fastball), or B. B. King (and he can no longer play guitar in the same fashion), or Annika Sorenstam (and she loses the distance on her drives). For these individuals, the ability to manipulate their pinky finger is important. Therefore, *143 the unambiguous language of MCL 500.3135(7) does not lend itself to any bright-line rule and the analysis of this prong must proceed on a case-by-case basis.
C. THAT AFFECTS THE PERSON’S GENERAL ABILITY TO LEAD HIS OR HER NORMAL LIFE
Central to the resolution of these cases is the proper interpretation of the third prong of the Legislature’s definition of “serious impairment of body function.” “Affect” means “[t]o have an influence on; bring kbout a change in.” American Heritage Dictionary, supra. “General” means:
1. Relating to, concerned with, or applicable to the whole or every member of a class or category. 2. Affecting or characteristic of the majority of those involved; prevalent: a general discontent. 3. Being usually the case; true or applicable in most instances but not all. 4. a. Not limited in scope, area, or application: as a general rule. b. Not limited to one class of things: general studies. [Id. (emphasis in original).]
“Able” means “having sufficient power, skill, or resources to accomplish an object [sic, objective].” Merriam-Webster Online Dictionary, <http://www.mw.com> (accessed June 21, 2004). Thus, the Legislature requires that the impairment have an influence on most, but not all, of the person’s capacity “to lead his or her normal life.”
The last phrase in the statutory definition of “serious impairment of body function” inevitably contemplates a subjective inquiry. The phrase “his or her normal life” requires a court to compare a particular plaintiffs life before and after the impairment. Further, a person’s “normal” life is unavoidably relative and, thus, inherently subjective. Because such an endeavor proceeds on a case-by-case basis and each particular plaintiffs ability to lead his own normal life is uniquely individual *144 ized, the third prong is not amenable to any bright-line rule or set of nonexhaustive factors.
In sum, the third prong of the serious impairment of body function analysis requires a reviewing court to compare the plaintiffs pre- and post-accident life and determine whether the impairment has an influence on most, but not all, of the plaintiffs capacities to lead his preaccident lifestyle.[2]
III. THE LEGISLATURE’S STATED TEST
On the basis of the foregoing, the unambiguous statute sets forth the following test. The first step in the serious impairment of body function analysis is to determine whether there is a factual dispute concerning the nature and extent of the person’s injuries and, if there is a factual dispute, whether the dispute is material to the serious impairment of body function issue.
If there is no factual dispute concerning the nature and extent of the person’s injuries, a question of law is presented for the trial court. MCL 500.3135(2) (a) (i).
If there is a factual dispute concerning the nature and extent of the person’s injuries, but the dispute is not material to adjudging whether the person has suffered a serious impairment of body function, a question of law is presented for the trial court. MCL 500.3135(2) (a) (ii).
If there is a factual dispute concerning the nature and extent of the person’s injuries and the dispute is *145 material to adjudging whether the person has suffered a serious impairment of body function, a question of fact is presented for the jury.
Once this initial determination is made, the second step is to decide whether the Legislature’s statutory definition has been fulfilled. Under the plain and unambiguous language of MCL 500.3135(7), the serious impairment of body function threshold is satisfied where the impairment is (1) an objectively manifested impairment (observable and identifiable), (2) of an important body function (a body function that the particular plaintiff deems valuable), (3) that affects the person’s general ability to lead his normal life (influences most, but not necessarily all, of the particular plaintiffs capacity to lead his own unique preaccident lifestyle).
The Legislature’s statutory definition does not lend itself to any bright-line rule or imposition of nonexhaustive list of factors. Instead, the “serious impairment of body function” inquiry proceeds on a case-by-case basis because the statute requires inherently fact-specific and circumstantial determinations. The Legislature recognized that what is important to one is not important to all, a brief impairment may be devastating whereas a near permanent impairment may have little effect. The Legislature avoided drawing lines in the sand and so must we.
IV APPLICATION OF THE LEGISLATURE’S STATED TEST
A. STRAUB V COLLETTE
Because there is no factual dispute regarding the nature and extent of plaintiff Straub’s injuries, the existence of a serious impairment of body function is determined as a matter of law. MCL 500.3135(2)(a)(i). *146 There is little debate that Straub’s injuries to his hand were observable and identifiable. Straub sustained a closed left fifth metacarpal fracture, as well as open wounds and tendon injuries to his middle and ring fingers. Thus, Straub’s impairment was objectively manifested and, therefore, the first prong of the statutory definition is satisfied.
The second prong of the serious impairment of body function analysis is satisfied where the impairment is to a body function that Straub considers valuable. According to Straub’s testimony, the injury to his hand was to an important body function. Straub relied on the use of his hand to work as a cable lineman, play guitar in his band, operate his bow shop during deer season, and perform household and personal tasks. Thus, because Straub’s use of his hand was related to important body functions, the second prong of MCL 500.3135(7) is satisfied.
Central to the resolution of this case is whether the third prong of the serious impairment analysis has been met; namely, whether the injury to his hand affected Straub’s general ability to lead his normal life. Under the undisputed facts in this case, I believe that Straub’s injury had an influence on most, but not all, of Straub’s capacity to lead his unique preaccident lifestyle.
Straub was able to work as a cable lineman before the motor vehicle accident, but could not perform that work following the accident. Further, before the injury, Straub played in a band that practiced three or four times a week and played at clubs almost every weekend. After the accident, Straub could not play his guitar. Before the accident, Straub would operate his bow shop during deer season, but, as a result of the motor vehicle accident, he could not operate his shop during the 1999 season. Finally, Straub had difficulty performing house *147 hold tasks in the same manner as he did before the accident. As such, the impairment to Straub’s hand had an influence on most, but not all, of his capacity to lead his preaccident lifestyle. Therefore, under the plain and unambiguous language of MCL 500.3135(7), Straub has satisfied the tort threshold and I would affirm the decision of the Court of Appeals.
The majority reaches a contrary conclusion because it imposes additional requirements on Straub that the Legislature never envisioned. The majority places great weight on the fact that
Straub’s injury was not extensive, recuperation was short, unremarkable, and virtually complete, and the effect of the injury on body function was not pervasive .... There is no medical evidence that Straub has any residual impairment or that the course of Straub’s life has been affected. The temporary limitations Straub experienced do not satisfy the statutory prerequisites. [Ante at 135-136 (emphasis added).]
However, the clear language of MCL 500.3135(7) does not make any express or implicit mention of time or temporal considerations. As noted above, under the no-fault act, a person may remain subject to tort liability if the injured person suffered death, permanent serious disfigurement, or serious impairment of body function. MCL 500.3135(1). Unlike death or permanent serious disfigurement, the serious impairment of body function threshold does not suggest any sort of temporal limitation. Further, the plain and unambiguous language of the statutory definition of “serious impairment of body function” does not set forth any quantum of time the judge or jury must find dispositive when determining whether a serious impairment of body function has occurred. Therefore, the duration of the impairment is not an appropriate inquiry.
*148 The majority noticeably departs from accepted principles of statutory interpretation when it concludes that certain temporal factors should be considered when evaluating whether the serious impairment of body function threshold has been met. For example, the majority reasons that “the type and length of treatment required,” “the duration of the impairment,” “the extent of any residual impairment,” and “the prognosis for eventual recovery” are relevant factors to consider when making the threshold determination.[3] Ante at 133. Unlike the majority, however, I do not find any support for these considerations in the unambiguous language of MCL 500.3135(7).
Moreover, the majority disregards the principles of statutory interpretation that it claims to follow. For example, in construing the term “lead” in convenient isolation, the majority states, “To ‘lead’ means, among other things, ‘to conduct or bring in a particular course.’. . . Given this meaning, the objectively manifested impairment of an important body function must affect the course of a person’s life. Accordingly, the affect of the impairment on the course of a plaintiffs entire normal life must be considered.” Ante at 130-131 (citation omitted and emphasis added). Additionally, the majority further asserts that the impairment “must be of sufficient duration to affect the course of a plaintiffs life.” Id. at 135. In what is best described as tortured logic, the majority has seen fit to impose a temporal requirement teetering on the brink of permanency into the unambiguous statute. Because the statute does not define “serious impairment of body function” with respect to permanency, or any temporal factor for that *149 matter, the majority impermissibly adds additional requirements not found in the text of MCL 500.3135(7).[4]
It is evident that the amount of time Straub was injured drives the majority’s result. A fair reading of the majority opinion seems to indicate that if Straub’s injuries were of a more permanent nature, the majority may be inclined to find that the requirements of MCL 500.3135(7) have been met. As mentioned above, however, unlike death or permanent serious disfigurement, nothing in the plain text of MCL 500.3135(7) suggests that the Legislature intended temporal limitations or permanency be considered when making the “serious impairment of body function” determination. Therefore, the majority errs when it reads additional language into the plain text of MCL 500.3135(7).
While this roughly four-month serious impairment of body function may appear to be at odds with the stated *150 purpose of the no-fault act, any trepidation over such a policy concern is best left to the Legislature. Because the statute does not speak in terms of “residual impairment,” “recuperation,” or “permanency,” this Court should avoid reading those requirements into the plain and unambiguous text of the statute.
B. KREINER V FISCHER
Because there is a factual dispute concerning the nature and extent of plaintiff Kreiner’s injuries and such a dispute is material to the serious impairment of body function issue, a question of fact is presented. Kreiner is a self-employed construction worker and carpenter. Additionally, Kreiner engages in recreational hunting. After the motor vehicle accident, Kreiner claimed he could no longer work eight-hour days, was unable to stand on a ladder longer than twenty minutes, could no longer perform general roofing work, was unable to lift heavy items, could no longer walk more than one-half mile, and could no longer hunt rabbits.
Defendant attempted to submit videotapes to the trial court that allegedly demonstrate that Kreiner’s injuries do not affect his life to the degree that Kreiner claims. Additionally, in its brief to this Court, defendant argues that these videotapes show Kreiner climbing up and down extension ladders, driving nails, tearing off siding, reaching, lifting, and crawling on a roof. In initially remanding this case, the Court of Appeals directed the trial court to consider the admissibility of the videotape offered by defendant to determine whether there are material issues of fact regarding Kreiner’s claims relative to the effects of his injuries. Kreiner v Fischer, 251 Mich App 513, 519; 651 NW2d 433 (2002), vacated and remanded 468 Mich 885 (2003). Thus, there is a factual dispute that is material to the *151 serious impairment of body function issue because if the effects of Kreiner’s injuries were undisputed, the requirements of MCL 500.3135(7) would be satisfied.
Kreiner’s injuries were observable and identifiable. The injury to Kreiner’s back was observable and verified by magnetic resonance imaging and electromyography examinations. Because the injury was objectively manifested, the first prong of MCL 500.3135(7) is satisfied. The second prong of the serious impairment of body function analysis is also satisfied because the impairment was to a body function that Kreiner deems valuable. According to Kreiner’s testimony, the injury to his back was to an important body function. Kreiner relied on the use of his back to sustain his livelihood as a construction worker and carpenter. Thus, the central issue for this Court to resolve is whether Kreiner’s injury affected his general ability to lead his normal life.
The third prong of the statutory definition of “serious impairment of body function” is satisfied if the impairment has an influence on most, but not all, of Kreiner’s capacity to lead his preaccident lifestyle. In resolving this issue, I find the reasoning of the Court of Appeals on remand to be persuasive.
We find that one’s general ability to lead his or her normal life can be affected by an injury that impacts the person’s ability to work at a job, where the job plays a significant role in that individual’s normal life, such as in the case at bar. Employment or one’s livelihood, for a vast majority of people, constitutes an extremely important and major part of a person’s life. Whether it be wrong or right, our worth as individuals in society is often measured by our employment. Losing the ability to work can be devastating; employment, regardless of income issues, is important to a sense of purpose and feeling of vitality. For those working a standard forty-hour work week, a quarter of their lifetime before retirement is devoted to time spent on the job. An *152 injury affecting one’s employment and ability to work, under the right factual circumstances, can be equated to affecting the person’s general ability to lead his or her normal life. For many, life in general revolves around a job and work. It would be illogical to conclude that where a person loses the ability to work because of an injury resulting from a motor-vehicle collision, after being gainfully employed, the person’s life after the accident, in general, would be unaffected. [Kreiner v Fischer (On Remand), 256 Mich App 680, 688-689; 671 NW2d 95 (2003).]
Moreover, the panel noted, “Here, there was documentary evidence presented by plaintiff that his ability to walk, undertake certain physical movements, and engage in recreational hunting was limited by the injury. These limitations along with plaintiffs alleged employment limitations, if true, indicate that plaintiff suffered a serious impairment of body function under § 3135.” Id. at 689. Under the circumstances presented in this case, I would affirm the decision of the Court of Appeals because if Kreiner’s claims are true, his injuries had an influence on most, but not all, of his capacity to lead his preaccident lifestyle. Additionally, because there is a factual dispute concerning the nature and extent of Kreiner’s injuries and such a dispute is material with respect to MCL 500.3135(7), I would likewise remand this case to the trial court.
In support of its conclusion that Kreiner did not satisfy MCL 500.3135(7), the majority places great weight on the notion that Kreiner’s life was “not significantly different than it was before the accident.” Ante at 137. Specifically, the majority posits Kreiner “was still able to perform all the work that he did before, with the possible exception of roofing work. His injuries did not cause him to miss one day of work.” Id. at 137 However, the majority also acknowledges that Kreiner “cannot work to full capacity . . . .” Id. at 137. *153 In an effort to reconcile this doublespeak, the majority then concludes that Kreiner’s work was simply a “particular aspect” of his life and that Kreiner’s “postimpairment life [was] not so different...Id. at 137.
Implicit in the majority’s rationale is the idea that a person has not suffered a serious impairment of body function unless that person is absolutely precluded from engaging in their particular preaccident lifestyle and the impairment lasts the length of the person’s life. Stated differently, it is not enough that Kreiner can only function at seventy-five percent of his preaccident work ability, because the majority would conclude that Kreiner must not be able to work at all.[5] It is not enough that Kreiner is limited in his lifting, bending, twisting, and standing, because the majority would conclude that Kreiner must not be able to lift, bend, twist, and stand at all.[6] The majority would conclude that it is not enough that Kreiner cannot hunt rabbits, because Kreiner can hunt deer. The majority would conclude that it is not enough that Kreiner can no longer walk one-half mile, because Kreiner can still walk.
Such an all-or-nothing approach is not supported by the unambiguous text of the statute. Moreover, it is evident that the indivisible sum of the affected lifestyle activities mentioned above leads to the logical conclusion that Kreiner’s injuries had an influence on most, but not all, of his capacity to lead his preaccident life. It is equally evident that the majority uses the facts of the *154 Kreiner case to effectively create a more rigorous threshold requirement than that mandated by the Legislature.
Despite the majority’s assertions to the contrary, its application of its stated test in Kreiner demonstrates that it believes that every aspect of a person’s life must be affected in order to satisfy the tort threshold, and the effects must last the course of the plaintiffs entire normal life. For example, the majority concludes that the term “general” in MCL 500.3135(7) means “entire,” “whole,” and “for the most part.” Ante at 130. Remarkably, the majority then determines that
whether a plaintiff is “generally able” to lead his normal life requires considering whether the plaintiff is, “for the most part” able to lead his normal life.
[T]he effect of the impairment on the course of a plaintiff’s entire normal life must be considered. Although some aspects of a plaintiff’s entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiffs normal life has not been affected, then the plaintiffs “general ability” to lead his normal life has not been affected and he does not meet the “serious impairment of body function” threshold. [Id. at 130, 131 (emphasis added).]
The majority further states, “we merely require that the whole life be considered in determining what satisfies [the] threshold ....” Id. at 133 n 16 (emphasis added).
The term “general” as used in MCL 500.3135(7) does not, as the majority asserts, modify the phrase “to lead his or her normal life.” Rather, “general” modifies the term “ability.”[7] In a disingenuous sleight of hand, the *155 majority attempts to create a more difficult test than that required by the Legislature. MCL 500.3135(7) does not require that the impairment affect every aspect of the course of a person’s “entire” or normal life.
Similarly, in its attempt to effectively raise the statutory threshold, the majority’s actual application of its test seeks to revive Cassidy v McGovern, 415 Mich 483; 330 NW2d 22 (1982), in full. In Cassidy, this Court previously held that the “serious impairment of body function” threshold was satisfied where the injury affects “the person’s general ability to live a normal life.” Id. at 505 (emphasis added). Later, in DiFranco v Pickard, 427 Mich 32, 66; 398 NW2d 896 (1986), this Court found that standard flawed because “there is no such thing as ‘a normal life.’ ” (Emphasis added.) In 1995, the Legislature amended the no-fault act and set forth its own definition of “serious impairment of body function.”
The majority claims that in 1995 the Legislature was “[apparently cognizant” of the DiFranco Court’s repudiation of Cassidy’s “a normal life” standard. Ante at 121 n 7. The majority further states:
[T]he Legislature, in the 1995 act, requires that the impairment affect “the person’s general ability to lead his or her normal life.” (Emphasis added.) It is then clear that, harkening to the DiFranco Court’s guidance that there is no objectively “normal life,” the Legislature modified the entirely objective Cassidy standard to a partially objective and partially subjective inquiry. [Id. at 121.]
In construing MCL 500.3135(7), the majority then concludes that the statute requires a comparison of the person’s pre- and post-accident lifestyle.
However, the majority merely pays lip service to its own construction and fails to actually compare Kreiner’s pre- and post-accident life. Kreiner framed the *156 effects of his impairment in terms of the limitations he experienced at work, hunting rabbits, lifting and twisting, and walking more than one-half mile. Kreiner convincingly argued that these particular aspects were the indivisible sum of his normal life. The majority, however, simply concludes that these particular aspects of Kreiner’s “life as a whole” are insufficient to meet the threshold. Implicit in the majority’s actual application of its test is the conclusion that “a normal life” cannot consist solely of work, hunting rabbits, lifting and twisting, and walking more than one-half mile. Yet, MCL 500.3135(7) requires the impairment affect the plaintiff’s normal life, not what the majority infers to be “a normal life.” Kreiner’s normal life apparently consisted of working, hunting rabbits, lifting and twisting, and walking one-half mile and, thus, he satisfied the statutory threshold. In my opinion, the majority’s actual application of its test is merely a subtle method of returning to the now refuted Cassidy “a normal life” standard in order to fashion what it believes to be a more difficult legislative definition.
The plain and unambiguous language set forth by the Legislature simply requires that the impairment affect a person’s general ability to lead his normal life. Unlike the majority, I prefer to simply apply MCL 500.3135(7) as written and leave any unresolved policy concerns in the hands of the Legislature.
V RESPONSE TO THE RESPONSE TO THE DISSENT
I am cognizant of the overall purpose of the no-fault scheme. Further, I am aware that my view may be perceived as an invitation to increased litigation; but this is the logical byproduct of the unambiguous words chosen by the Legislature. Any apparent tension be *157 tween the act’s overall purpose and the Legislature’s unambiguous statutory definition is best addressed by the Legislature itself.
The majority suggests that my approach is sacrilegious to the “no-fault temple” and is an exercise predicated on “studied ignorance.” Ante at 138. While admittedly unaware that I was required to worship the no-fault insurance gods, I believe that my “studied ignorance” is more properly labeled as “judicial restraint.” If ignorance comes from applying this unambiguous statute as written and not substituting my own view for that of the Legislature, I must say that ignorance is bliss. If so-called wisdom comes from rewriting this unambiguous statute to comport with my own preference on how the statute should be written and applied, in this instance I must choose “ignorance.”
Today’s decision serves as a chilling reminder that activism comes in all guises, including so-called textualism.
VI. CONCLUSION
Under accepted principles of statutory interpretation, a plain and unambiguous statute should speak for itself. We should not casually read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute. Because the majority departs from this premise, I must respectfully dissent. Rather, I would apply MCL 500.3135 as unambiguously written and, thus, affirm the decisions of the Court of Appeals.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 Although it may be appropriate for a court to engage in a so-called objective analysis of the “important body function” prong, such an analysis is still undertaken with the goal of ascertaining the subjective importance that a particular plaintiff places on that body function.

 Similar to the second prong, the third prong of the analysis is inherently subjective in nature. While a court may engage in a so-called objective analysis to determine whether the impairment affects the person’s general ability to lead his normal life, this endeavor is made with the understanding that a person’s subjective normal life is the relevant frame of reference.

 Curiously, the majority finds support for these factors in Hermann v Haney, 98 Mich App 445; 296 NW2d 278 (1980), and DiFranco v Pickard, 427 Mich 32; 398 NW2d 896 (1986).

 The majority poses the following question which I believe is indicative of the difference between the majority and the dissent in this case:
Does the dissent really believe that an impairment lasting only a few moments has the same effect on a person’s “general ability to lead his or her normal life” as an impairment lasting several years or that an impairment requiring annual treatment has the same effect on a person’s “general ability to lead his or her normal life” as an impairment requiring daily treatment? [Ante at 133 n 18.]
In response, I must note that the statutory threshold is evaluated on a case-by-case basis and under the majority’s rationale none of the majority’s hypothetical plaintiffs is likely to meet the threshold. The majority would effortlessly conclude that interrupting several years out of, for example, forty is a minor interruption. This is precisely the reason why this Court should avoid reading additional temporal requirements into the unambiguous statute.
Moreover, my interpretation of MCL 500.3135(7) is not based on what I believe or hope. Rather, my interpretation is based on how the unambiguous statute is written and, unlike the majority, not how I personally believe the statute should he written.

 The majority notes that “[djespite his limitations, Kreiner’s tax returns revealed that 1998 was his highest income-earning year, including several years before the injuries occurred.” Id. at 126 n 12. However, such an assertion ignores the idea that Kreiner claims to have been working at seventy-five percent of his preaccident ability. If Kreiner’s claims are true, Kreiner may have earned twenty-five percent more that year. Thus, I do not find Kreiner’s 1998 tax returns dispositive.

 As noted by the Court of Appeals, “injuries affecting the ability to work, by their very nature, often place physical limitations on numerous aspects of a person’s life.” Kreiner (On Remand), supra at 689.

 Again, MCL 500.3135(7) defines “serious impairment of body function” as “an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.”